UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————
VICTOR FELICIANO,

                                        Plaintiff,

            - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                        Defendant.
————————————————————————

REPORT AND
RECOMMENDATION

12-CV-6202 (PGG)(RLE)

TO THE HONORABLE PAUL G. GARDEPHE, U.S.D.J.:

## I. INTRODUCTION

Plaintiff Victor Feliciano ("Feliciano") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for social security disability benefits. On August 30, 2013, he moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to modify the decision of the Commissioner, or to remand the case for reconsideration of the evidence. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.")) On January 31, 2014, the Commissioner cross-moved for a judgment on the pleadings in opposition to Feliciano's motion, asking the Court to affirm the Commissioner's decision and dismiss the Complaint. (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings and in Opp'n to Pl.'s Mot. on the Pleadings ("Def. Opp'n.")) For the reasons that follow, I recommend that the Commissioner's motion be **GRANTED,** and that the case be **DISMISSED**.

## II. BACKGROUND

### A. Procedural History

Feliciano applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on May 15, 2008. (Tr. of Admin. Proceedings ("Tr.") at 12.) He claimed a disability onset date of January 1, 2004. (*Id.* at 105.) The application was denied on June 20, 2008, and Feliciano requested a hearing before an ALJ on July 25, 2008. (*Id.* at 61-72, 73.) Represented by counsel, Feliciano appeared before ALJ Seth I. Grossman ("Grossman" or "ALJ") on April 22, 2010. (*Id.* at 83-104.) Grossman issued a decision on June 1, 2010, finding that Feliciano was disabled under the Act as of May 15, 2008, and approving his application for SSI. (*Id.* at 23-34.) Grossman denied Feliciano's application for DIB because he found that Feliciano was not disabled before March 31, 2005, the date he was last insured for DIB. (*Id.* 12-19.)

Feliciano requested review by the Appeals Council on August 23, 2011. (*Id.* at 6-7.) He submitted additional evidence, including a brief by counsel. (*Id.* at 5.) The Appeals Council denied Feliciano's request for review on June 8, 2012, making the ALJ's findings the Commissioner's final decision. (*Id.* 1-5.) Feliciano filed this action on August 30, 2013.

Feliciano asks the Court to modify the decision of the Commissioner and grant him disability benefits, retroactive to the date of the initial disability, or, in the alternative, to remand the case to the Social Security Administration for further reconsideration of the evidence. He argues that the decision of the ALJ was erroneous and not supported by substantial evidence. Feliciano raises three issues: (1) the ALJ failed to properly evaluate the medical evidence; (2) the ALJ's vocational analysis was flawed; and (3) the ALJ failed to properly evaluate Feliciano's credibility.

## B. The ALJ Hearing

### 1. Feliciano's Testimony at the Hearing

Feliciano was born on August 27, 1953. (*Id.* at 57.) He completed high school in 1968. (*Id.* at 128.) From 1978 to 1999, he worked for the New York City Housing Authority ("NYCHA") as a janitor and caretaker. (*Id.* at 33.) Feliciano resigned from NYCHA after he was convicted for possession of narcotics. (*Id.* 34-39.) He testified that he was innocent but pleaded guilty to prevent his father from going to jail. (*Id.* at 52.) After completing his prison sentence, Feliciano worked as a security guard for Rite Aid for approximately one month in 2002. (*Id.* at 154.) Feliciano stated that he was not employed from 2003 to 2006. (*Id.* at 115.) He testified that in 2007, he earned some money "helping his brother out," but that he did not consider himself employed. (*Id.* at 40-41.)

In 2008, Feliciano reported to the Federation Employment & Guidance Services ("FEGS") that he had suffered from untreated depression since at least 2001. (*Id.* at 48.) He testified that incarceration and loss of employment at the NYCHA were the catalysts for his depression. (*Id.* at 46.) Feliciano initially stated that he could have worked in 2004 and 2005, but there were no jobs available. (*Id.* at 45-46.) He then claimed that he did not believe he could have worked in 2004, even if offered employment, because of the severity of his depression. (*Id.* at 47.) Feliciano also testified that if NYCHA offered him his previous position during that time period he would have accepted employment. (*Id.* at 47-48.)

Feliciano testified that he suffered serious back problems arising from a car accident on April 7, 2004. (*Id.* at 51-53.) He did not go to the hospital immediately after the accident, but did receive X-rays and magnetic resonance imaging ("MRI") scans of his back a few days later at a physical therapy session. (*Id.* at 52.) He was diagnosed with muscle spasms, splitting in the

3

cervical spine, focal disc bulges and herniated discs. (*Id.* at 491-92.) As a result of his injuries, Feliciano testified that he cannot lift more than twenty pounds. (*Id.* at 53-54.)

### 2. Medical Evidence Prior to March 31, 2005

#### a. Peter Albis, D.C. (2004)

After the car accident in 2004, Feliciano was treated by Peter Albis, D.C., a chiropractor at Tri-State Chiropractic. (*Id.* at 496.) On April 8, 2004, Albis noted that Feliciano's "gait was guarded but he did not need assistance to walk." (*Id.* at 497.) Feliciano complained of dizziness, intense upper and lower back pain, difficulty breathing due to asthma, intense headaches, and loss of cervical and lumbar range of motion. (*Id.* at 496.) Albis reported that his examination of the cervical, thoracic, and lumbar spines revealed muscle spasms, swelling, and weakening of the spinal muscles. (*Id.*)

Albis diagnosed Feliciano with subluxation[1] of the cervical, thoracic, and lumbar spines as well as cervico-cranial syndrome,[2] (*id.* at 499), and recommended chiropractic manipulative therapy, sensorimotor control training, ultrasound, electric stimulation, massages, and rehabilitation exercises. (*Id.*) He also recommended MRI's of the cervical and lumbar spines to rule out disc displacement and other soft tissue injuries. (*Id.*) Based upon his examination, Albis referred Feliciano to a neurologist, a psychologist, an acupuncturist, and an internist for further evaluation. (*Id.* at 500.) His prognosis of Feliciano's condition was that it was "guarded pending further treatment and evaluation" and he "restricted [Feliciano] from driving, heavy lifting and bending, and sitting for extended periods of time." (*Id.* at 501.)

---

[1] Subluxation is a misalignment of vertebrae in the spine. (Steven Yeomans, *Subluxation and Chiropractic*, Spine-Health (Oct. 7, 2009), http://www.spine-health.com/treatment/chiropractic/subluxation-and-chiropractic.)
[2] Cervico-cranial Syndrome, also known as "Barre-Lieou syndrome," is a misalignment of vertebrae that may cause dizziness, facial pain, or a dull, constant throbbing at the base of the skull. (*Barre Lieou Syndrome*, Journal of Neurology, Neurosurgery, & Psychiatry (2004), http://jnnp.bmj.com/content/75/2/319.full#ref-2.)

### b. Syed M. Jalal, M.D.

On April 9, 2004, Dr. Syed M. Jalal, a neurologist at Pelham Parkway Neurology and Diagnostic P.C., examined Feliciano. (*Id.* at 493.) Feliciano complained of pain in his neck, upper and lower back, and bilateral buttocks, originating with the April 4 car accident. (*Id.*) Feliciano reported that he was unable to work because sitting and standing for long periods of time aggravated his back symptoms. (*Id.*) Dr. Jalal observed that Feliciano's lumbar and thoracic spines were both tender. (*Id.*) (*Id.*) He recommended "heat massage, electrical stimulation, ultrasound, and range of motion and muscle strengthening of cervical, thoracic, and lumbosacral spines," and prescribed enteric-coated Naprosyn and Elavil. (*Id.*)

On April 30, Dr. Jalal also noted that Feliciano had undergone two separate MRI's since his last consultation. (*Id.*) The cervical spine MRI, taken on April 14 by Charles DeMarco of the Williamsbridge Radiology & Open Imaging, P.C., showed disc bulges in Feliciano's cervical spine but no fracture, accumulated blood between the discs, and spinal swelling. (*Id.* at 470.) The lumbar spine MRI, taken on April 15, by Dr. Joseph McCarthy at the same location showed dislocated lumbar discs and a small disc herniation. (*Id.* at 471.) Feliciano continued to report neck and back pains that were aggravated by coughing or by standing for more than five minutes. (*Id.* at 491.)

Dr. Jalal observed that Feliciano's neck movements continued to be limited and painful. (*Id.*) He diagnosed Feliciano with acute cervical, thoracic, and lumbosacral sprains, possible bilateral lumbosacral radiculopathies, disc herniation, and bulges in the cervical and lumbar spines. (*Id.*) Dr. Jalal recommended upper and lower Somato Sensory Evoked Potentials[3] to

---

[3] Somato Sensory Evoked Potentials are a series of electrical waves that stimulate the nerves along the spine to determine the nervous system's electrical signals for the purpose of neurological diagnoses. (Alan Legatt, *General Principles of Somatosensory Evoked Potentials*, Medscape (Feb. 3, 2012) http://emedicine.medscape.com/article/1139906-overview.)

determine other areas of possible injury. (*Id.* at 492.) Dr. Jalal prescribed continuing physical therapy, and taking Naprosyn and Elavil. (*Id.*)

### c. Ahmed Elfiky, M.D.

On August 6, 2004, Dr. Ahmed Elfiky, a neurologist at Accurate Medical, P.C, evaluated Feliciano. (*Id.*) Feliciano reported stiffness and pain in his neck and lower back that radiated to both his hips and buttocks. (*Id.*) Dr. Elfiky noted moderate paraspinal[4] areas of tenderness and muscle spasms along Feliciano's lumbar spine. (*Id.*) He also observed mild weakness in Feliciano's hip flexion and leg extensions, and a mild limp in Feliciano's gait. (*Id.* at 475-76.)

Dr. Elfiky diagnosed Feliciano with disc bulges and myofascial pain[5] in the cervical spine, and herniated and bulging discs with radiculitis[6] in the lumbar spine. (*Id.* at 477.) He administered a paravertebral nerve block injection on August 6. (*Id.* at 478.) Dr. Elfiky prescribed Vicodin and Naprosyn, and recommended that Feliciano continue chiropractic and physical therapy treatment. (*Id.* at 477.)

On September 22, Dr. Elfiky evaluated Feliciano again. (*Id.* at 472.) Feliciano complained of intermittent neck stiffness and pain along with lower back pain that radiated to his bilateral buttocks. (*Id.*) Dr. Elfiky noted that Feliciano had not returned to work since the accident and was no longer taking pain medication. (*Id.*) He observed that Feliciano continued to receive chiropractic and physical therapy treatment as well as nerve-blocking injections. (*Id.*) He also noted that Feliciano continued to demonstrate weakness in his bilateral hip movements. (*Id.*)

---

[4] The paraspinal is the area located along the side of the spinal column. (*Paraspinal*, Merriman-Webster Online (Retrieved June 2, 2014) http://www.merriam-webster.com/medical/paraspinal.)

[5] Myofascial pain refers to pain caused by muscular irritation that can radiate throughout muscle tissue. (Robert Bennett, *Myofascial Pain Syndrome and their Evaluation* 427-45 (2007).)

[6] Radiculitis refers to pain that radiates along the nerve caused by inflammation at the root of its connection to the spinal column. (Pamela Verkuilen, *Radiculopathy, Radiculitis, and Radicular Pain* (Dec. 18, 2005) http://www.spine-health.com/conditions/spine-anatomy/radiculopathy-radiculitis-and-radicular-pain.)

Dr. Elfiky diagnosed Feliciano with cervical myofascial pain and herniated discs with radiculitis in the lumbar spine. (*Id.*) He recommended that Feliciano take Advil or Aleve and continue chiropractic and physical therapy treatments. (*Id.*) He also recommended an additional paravertebral nerve block injection for pain management. (*Id.*)

### 3. Medical Evidence after March 31, 2005

#### a. FEGS Biopsychosocial Summary (2006)

FEGS prepared a biopsychosocial summary of Feliciano's health from July 24 to July 31, 2006. (*Id.* at 162-76.) A FEGS examiner noted that Feliciano reported that he was moderately depressed and had passive thoughts of suicide but no intention of hurting himself. (*Id.* at 167, 170.) Feliciano also reported that he was able to complete basic tasks at home but had difficulty traveling because of chronic back pain and numbness in his knees. (*Id.* at 168.) Although Feliciano continued to attend physical therapy, he noted that his back pain continued to be a barrier to employment. (*Id.* at 170.)

The FEGS examiner observed that Feliciano was taking medication for asthma. (*Id.* at 172.) The examiner diagnosed Feliciano with asthma and lower back pain. (*Id.* at 174.) The examiner recommended accommodations for Feliciano's employment, including the limiting of lifting and bending. (*Id.* at 175.) The examiner indicated that Feliciano was able to sit for six to eight hours, stand and walk four to five hours, and lift ten pounds from ten to fifteen times an hour per workday. (*Id.*) The examiner noted that with these limitations, Feliciano could complete light work duties for thirty hours a week. (*Id.*)

#### b. Montefiore Medical Center Hospital (2007)

From June 23 to September 15, 2007, Feliciano was treated for chest tightness, wheezing, coughing, and shortness of breath at Montefiore Medical Center Hospital ("Montefiore"). (*Id.* at

7

273-313.)  On June 23, Montefiore doctors diagnosed Feliciano with a moderate asthma attack.
(*Id.* at 279.)  On July 16, staff at a regular check-up at Montefiore indicated that Feliciano's
asthma attacks occurred when he did not comply with his medication.  (*Id.* at 298.)  On August
23, Feliciano complained of chest tightness and wheezing.  (*Id.* at 302.)  Montefiore doctors
diagnosed him with an asthma attack and prescribed Albuterol and Prednisone.  (*Id.* at 310.)  On
September 15, Feliciano had another asthma attack.  At that time, he reported that he had been
taking his medication since his last visit. (*Id.* at 283.)  Montefiore doctors prescribed Albuterol,
Prednisone, and Advair, and released him in good condition on the same day.  (*Id.* at 293-295.)

### c. FEGS Biopsychosocial Summary (2008)

FEGS prepared a summary of Feliciano's health from January 14 to January 31, 2008.
(*Id.* at 177.)  Feliciano reported that he was moderately depressed and was not receiving
treatment.  (*Id.* at 183.)  He reported that he continued to suffer from asthma and back pain
resulting from a herniated disc.  (*Id.* at 185.)  Feliciano indicated that he was taking Loratadine,
Prednisone, Biaxin, Advair, and Singulair.  (*Id.*)  The FEGS examiner diagnosed Feliciano with
asthma, chronic lower back pain, and depression, (*id.* at 191), and referred him to a psychologist
for his depression and post-traumatic stress disorder ("PTSD") symptoms.  (*Id.* at 188-90.)  The
examiner noted that Feliciano " . . . [could] only stand or walk one to three hours a day and could
lift no more than ten pounds from ten to fifteen times an hour."  (*Id.*)  Additionally, the examiner
concluded that Feliciano "clearly cannot work at present and needs three months of wellness
health care."  (*Id.*)

### d. Frias Barakat, M.D. (2008)

Feliciano met with Dr. Frias Barakat of B&K Medical Associates on March 27, 2008.
(*Id.* at 411-12.)  He diagnosed Feliciano with asthma, depression, and backache.  (*Id.* at 411.)

Dr. Barakat determined that Feliciano was unable to work for at least twelve months and was therefore potentially eligible for long-term disability benefits. (*Id.* at 412; *see also Id.* at 355-63 (additional treatment notes and analysis.))

### e. North Central Bronx Hospital (2006-2007)

On May 28, 2008, the North Central Bronx Hospital ("North Central") completed a report of Feliciano's medical history. (*Id.* at 258.) The report indicated that Feliciano went to North Central for lower back pain and asthma on July 10, 2006. (*Id.* at 259.) On August 16, 2006, and April 17, 2007, Feliciano returned to North Central with complaints of lower back pain. (*Id.*) On June 2, 2006, March 3, 2007, and April 15, 2007, Feliciano went to North Central because of acute exacerbations of his asthma. (*Id.* at 258-261.) On September 23, 2006, doctors at North Central diagnosed Feliciano with rhinitis[7], which they indicated was caused by his asthma. (*Id.* at 260.)

### f. Eric A. Lubin, M.D. (2008)

On June 6, 2008, Dr. Eric A. Lubin of DosiDiagnostic conducted an MRI of Feliciano's back. (*Id.* at 416.) He diagnosed Feliciano with a mild degree of neural foraminal stenosis.[8] (*Id.* at 414.) Dr. Lubin found herniated and bulging discs in Feliciano's lower back. (*Id.*) In addition to the herniated and bulging discs, Dr. Lubin determined that Feliciano had diffuse

---

[7] Rhinitis is the inflammation of the mucous membrane in the nose. (Walter Becker et al., *Ear, Nose and Throat Diseases* 150 (3d ed. 2009).

[8] Spinal stenosis is a narrowing of the open spaces within the spine, which can put pressure on the spinal cord and the nerves that travel through the spine. (John Hsiang, *Spinal Stenosis*, Medscape (Mar. 26, 2014) http://emedicine.medscape.com/article/1913265-overview.)

degenerative disc disease[9] and spondylosis[10] in his lower back. (*Id.* at 416.) He recommended an ultrasound to confirm his finding of a cyst on Feliciano's left kidney. (*Id.*)

### g. Arlene Broska, Ph.D. (2008)

On June 10, 2008, Dr. Arlene Broska, a psychologist at Industrial Medical Associates, P.C., evaluated Feliciano. (*Id.* at 262.) Feliciano reported that he had difficulty sleeping and felt "down and stressed out." (*Id.*) Feliciano indicated that he had anxiety attacks and suffered from post-traumatic stress associated with being incarcerated and sexually abused as a child. (*Id.*) He reported having heart palpitations, sweating, dizziness, chest pains, fear of dying, and breathing difficulties. (*Id.*)

Dr. Broska noted that Feliciano had no history of psychiatric hospitalizations nor was he receiving any outpatient treatment. (*Id.*) She noted that Feliciano's demeanor was cooperative and his manner of relating, social skills, and overall presentation were adequate. (*Id.* at 263.) Dr. Broska concluded that, "[v]ocationally, [Feliciano] can follow and understand simple directions and instructions" and "perform simple tasks, maintain concentration, and learn new tasks," although "he may not always appropriately deal with stress." (*Id.* at 265.) Dr. Broska also concluded that Feliciano was " able to maintain a regular schedule unless contraindicated for medical reasons." (*Id.*) Dr. Broska diagnosed Feliciano with adjustment disorder with mixed anxiety and depressed mood, panic disorder, and post-traumatic stress disorder. (*Id.*) She recommended psychiatric and psychological therapy. (*Id.*) She noted that Feliciano's prognosis was "fair." (*Id.*)

---

[9] Degenerative disc disease is a series of changes in the spine in the form of herniated discs, loss of spinal fluid, or spinal stenosis that puts pressure on the spine and results in pain or nerve damage. (*Degenerative Disc Disease*, WebMD (Mar. 12, 2012) http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview.)
[10] Spondylosis refers to the degenerative osteoarthritis of the joints between the center of the spinal vertebrae and/or the neural foramina. (*Cervical Spondylosis*, Mayo Clinic (June 12, 2012) http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408.)

### h. William Lathan, M.D. (2008)

On June 10, 2008, Dr. William Lathan of Industrial Medicine Associates, P.A., conducted an internal medicine examination of Feliciano. (*Id.* at 265.) Feliciano reported having intermittent mid-lumbar back pain that radiated to his legs. (*Id.* at 267.) He indicated that he had been going to physical therapy and taking pain medication, including Tramadol, Skelaxin, Advair, Albuterol, and Singulair, for the past twelve months. (*Id.*) He also indicated that he could not stand or walk for more than twenty minutes without feeling pain, and that bending aggravated his pain. (*Id.*) Feliciano, however, reported that he was able to perform all daily and personal care activities without difficulty. (*Id.*)

Dr. Lathan observed that Feliciano's gait was normal but that he felt pain when walking on his heels or toes. (*Id.* at 268.) He noted no abnormalities in Feliciano's spine. (*Id.*) He observed that Feliciano's cervical spine had a full range of movements but his lumbar spine's range of motion was limited. (*Id.*) Dr. Lathan concluded that Feliciano had asthma and hypertension. (*Id.*) He opined that Feliciano had a moderate restriction in bending, squatting, kneeling, and prolonged standing and walking, (*id.* at 269-270), and recommended that Feliciano avoid smoke, dust, and noxious fumes. (*Id.* at 270.)

### i. Tirza Santilli, N.P. (2008)

On November 13, 2008, Tirza Santilli, a nurse practitioner from Promesa, Inc. Mental Health Department, evaluated Feliciano. (*Id.* at 427.) Feliciano stated that he had trouble with anxiety, sleeping, and depression since losing his job and moving into a shelter. (*Id.*) He also reported that he had no prior treatment history for his mental issues. (*Id.*) Santilli diagnosed

Feliciano with depressive disorder (NOS)[11] and major depressive affective disorder.[12]  (*Id.* at 435.)  She noted that Feliciano's global assessment of functioning (GAF)[13] was 60.  (*Id.* at 428.)  Santilli did not find any indication of PTSD in Feliciano.  (*Id.*)  She prescribed Cymbalta, Abilify, and Trazadone and individual supportive therapy four times a week.  (*Id.* at 438.)

### j. Frias Barakat, M.D. (2009-2010)

Dr. Frias Barakat completed medical assessments of Feliciano's ability to do work-related activities on February 23, 2009, and April 15, 2010.  (*Id.* at 418-24.)  He concluded that the herniated disc in Feliciano's back prevented lifting anything over five pounds and standing or walking for more than two hours.  (*Id.* at 418.)  In both reports, Dr. Barakat stated that, "[Feliciano could] not climb, stoop, kneel, crouch or crawl, [essentially] eliminating any sedentary work."  (*Id.*)  Dr. Barakat also concluded that because of Feliciano's asthma, he could not work around dust or fumes.  (*Id.* at 420.)

### k. Peter Albis (2009)

Mr. Peter Albis wrote a report on Feliciano's health on March 31, 2009.  (*Id.* at 479-84.)  He indicated that he initially evaluated Feliciano on April 8, 2004, and prescribed chiropractic and physical therapy as well as acupuncture treatment from April 8, 2004, to November 23, 2004.  (*Id.* at 479.)  Since his last treatment in 2004, Feliciano reported that he had discontinued therapy and his back injury had worsened.  (*Id.*)  He reported intense pain and stiffness in the

---

[11] "NOS" means "not otherwise specified": Depressive disorders that are impairing but do not fit any of the officially specified diagnoses.  (Tr. at 435.)

[12] Major depressive disorder is a mental disorder characterized by pervasive and persistent low mood that is accompanied by low self-esteem that affects a person's daily activities.  (Joseph Goldberg, *Major Depression*, WebMd (Feb. 11, 2014) http://www.webmd.com/depression/guide/major-depression.)

[13] The global assessment of functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults.  (Access Behavioral Health, *Global Assessment of Functioning, available at* https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.)  A GAF score of 60 is associated with "moderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers)."  (*Id.*)

cervical and lumbar spines, muscle weakness, loss of range of motion, sharp shooting pains in the back of his legs, difficulty in bending and standing, difficulty sleeping, and difficulty in lifting objects. (*Id.* at 482.) After conducting several tests, Albis diagnosed Feliciano with a herniated disc in the lumbar spine, lumbar radiculopathy, cervico-cranial syndrome, and misalignment of the cranial spine, thoracic spine, and lumbar spine. (*Id.* at 483.)

Albis concluded that Feliciano suffered from herniated discs with nerve compression in his lower back and disc bulges in his neck and lower back, and that his condition appeared to be permanent. (*Id.* at 484.) Albis noted that Feliciano cannot sit, stand, or bend for more than five minutes without adequate time to stretch. (*Id.*) He concluded that Feliciano was restricted from reaching and lifting objects weighing more than ten pounds. (*Id.*) He noted, " . . . it may be stated with a reasonable degree of medical certainty that plaintiff's spinal injuries were due to the April 7, 2004, motor vehicle accident and recovery is unlikely." (*Id.*) Albis recommended that Feliciano start a home exercise program and return to chiropractic therapy. (*Id.*)

### l. FEGS Biopsychosocial Summary (2010)

On January 22, 2010, FEGS prepared a biopsychological summary on Feliciano's mental and physical health. (*Id.* at 388.) Feliciano reported that he had been receiving mental health medication to treat his depression for the past two years. (*Id.*) The FEGS examiner indicated that Feliciano had moderate depression and passive suicidal ideation. (*Id.* at 398.) The examiner stated that Feliciano's chronic back pain had not improved and continued to prevent him from finding employment. (*Id.* at 409.) The examiner opined that Feliciano's back pain and medical conditions would last more than twelve months. (*Id.*) Accordingly, since Feliciano's back pain continued to prevent him from working, FEGS recommended that he receive SSI benefits. (*Id.*)

13

# III. DISCUSSION

## A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); accord *Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); accord *Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); accord *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). See, e.g., *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); accord *Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002

WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409

(reconsideration of improperly excluded evidence typically requires remand).  Eschewing rote

analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether the

determination is supported by substantial evidence."  *Calzada v. Astrue*, 753 F. Supp. 2d 250,

269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When "new and material evidence" is submitted, the Appeals Council may consider the

additional evidence "only where it relates to the period on or before the date of the administrative

law judge hearing decision."  20 C.F.R. § 404.970(b).  "New evidence" refers to "any evidence

that has not been considered previously during the administrative process."  *Shrack v. Astrue*,

608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B. Determination of Disability

### 1.  Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is

entitled to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as

an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* at

§§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A

claimant's impairments must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work

activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the

regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not,

determine whether the claimant possesses the RFC to perform his past work despite the

disability; and (5) if not, determine whether the claimant is capable of performing other work.

20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F.

Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at

the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant

is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*,

692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the

Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a

disability exists if the claimant proves that his or her severe impairment meets or medically

equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the

Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R.

§§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-

9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

18

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a pro se claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the

treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

## C. Application to This Case

### 1. The ALJ's Findings

#### a. Social Security Disability Benefits – March 31, 2005

On June 1, 2010, ALJ Seth I. Grossman ("Grossman") issued a decision partially favorable to Feliciano. (Tr. at 8-23.) Grossman denied Feliciano DIB benefits but granted him SSI payments from the date of his application. (*Id.* at 13.) Grossman noted that Feliciano had not engaged in substantial gainful activity since the alleged onset date of his disability, even though he earned $8,580 in 2007. (*Id.*) Grossman determined that Feliciano had maintained an

20

insured status under the Act until March 31, 2005. (*Id.* at 14.) In order to receive DIB, Feliciano must have been under a disability within the meaning of the Social Security Act before March 31, 2005. (*Id.* at 13). Grossman found, " . . . no medical signs, laboratory findings, or any medical evidence to substantiate the existence of a medically determinable impairment" prior to March 31, 2005. (*Id.* at 15.)

Grossman determined that Feliciano's back pain lasted less than the required twelve-month period. (*Id.*) He noted that although Feliciano received MRI's and treatment beginning in September 2004, the treatment ended in November 2004, and there were no additional records showing treatment in 2005 or 2006. (*Id.*)

Grossman noted that although Feliciano visited the emergency room in June 2004 for an asthma attack, there were no additional reports of emergency room visits for asthmatic symptoms in 2005 and 2006. (*Id.*) Grossman also found that the record had no other indications of difficulty with asthma. (*Id.*) Finally, Grossman concluded that there were no treatment documents prior to 2006 that confirmed Feliciano's depression. (*Id.*) Although Feliciano indicated to examiners in 2010 that he suffered from untreated depression for many years, Grossman noted that Feliciano's medical records do not indicate treatment for depressive symptoms prior to 2006. (*Id.*)

Grossman found that Feliciano did not meet his burden of providing medical evidence showing a medically determinable impairment along with evidence that could indicate the severity of the impairment. (*Id.*) Accordingly, Grossman ruled that Feliciano was not under a disability prior to March 31, 2005, and therefore was not eligible for disability insurance benefits. (*Id.*)

21

### b. Supplemental Security Income on May 15, 2008

At step one of the analysis, Grossman concluded that Feliciano suffered from severe impairments including asthma, degenerative disc disease, and depressive affective disorder dating back to May 15, 2008, the date his application was filed.[14] (*Id.* at 12-16.) Grossman found that Feliciano's impairments caused more than minimal functional limitations. (*Id.* at 16.)

At step two of the analysis, Grossman found that while Feliciano suffered from severe impairments, none of his impairments met or equaled the severity of any of the listed impairments found in 20 C.F.R. Part 404, Subpart P Appendix 1 (the "Listings"). (*Id.* at 15-16.) Grossman considered Listing 1.04 for Feliciano's degenerative disc disease and found that the criteria had not been met. (*Id* at 16.) Listing 1.04 requires, "a disorder of the spine, resulting in compromise of a nerve root or the spinal cord with either evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis . . . " (*Id.*) Grossman found that Feliciano's depression did not meet the criteria of a medical impairment under Listing 12.04 because his depression did not "cause him 'marked' restriction in at least two of the following: (1) daily living activities; (2) social functioning; (3) ability to maintain concentration, persistence or pace [or]; (4) restrictions caused by repeated episodes of decompensation, each of extended duration." (*Id.*)

At the third step of the analysis, Grossman determined that, beginning on May 15, 2008, Feliciano had a residual functional capacity ("RFC") to perform "a full range of sedentary work," but that he was limited to work that does not involve exposure to dust, fumes or other respiratory irritants. (*Id.* at 16-19.) Grossman found Feliciano's allegations of degenerative disc disease, asthma, and mental illness to be generally credible. (*Id.* at 17.) Grossman noted that

---

[14] An SSI claimant is eligible to receive benefits retroactive to their application date, but no earlier. (20 C.F.R. 416.335 and 416.912(d). (*Id.* at 13-16.)

clinical records from the North Central Bronx Hospital and the Montefiore Medical Center established that Feliciano suffered from asthma and was hospitalized three times in 2007. (*Id.*) Additionally, Grossman determined that the results of MRI's Feliciano underwent in June 2008 supported the diagnosis of degenerative disc disease. (*Id.*)

In finding Feliciano's RFC, Grossman gave weight to the treating physician, Dr. Barakat, who indicated that Feliciano could lift no more than ten pounds because of a herniated disc and that Feliciano was limited to sitting for two to four hours, and walking and standing for up to four hours. (*Id.*) Grossman also gave weight to Dr. Lathan's assessment that Feliciano had a moderate restriction in bending, kneeling, stooping, or prolonged walking or standing. (*Id.*) In addition to Dr. Barakat and Dr. Lathan, Grossman also gave weight to the opinions of Dr. Broska and Nurse Santilli as they had the opportunity to examine Feliciano and their opinions were consistent with the medical evidence in the record. (*Id.* at 18.) Grossman gave little weight to the physical and mental assessments conducted by the State, because they did not have the opportunity to examine Feliciano. (*Id.*)

With respect to Feliciano's mental illness claim, Grossman stated that records from FEGS, Montefiore, and Clay Avenue Health Center indicated that Feliciano had been receiving mental health treatment since 2008. (*Id.*) Grossman noted that Dr. Broska had opined that while Feliciano experienced symptoms of depression, he was able to follow and understand simple directions, perform simple tasks independently, maintain concentration, and learn new tasks. (*Id.*) Based on the "clinical and laboratory evidence, the medical opinions, and the claimant's testimony" Grossman determined that Feliciano had the residual functional capacity to perform the full range of sedentary work. (*Id.* at 18.)

Next, Grossman found that Feliciano was not fit to perform past relevant work. (*Id.*) He noted that "the demands of [Feliciano's] past relevant work as a caretaker exceeded the residual functional capacity." (*Id.*) He also found Feliciano to be "an individual of advanced age" with limited education but the capacity to speak English. (*Id.*) At the final step of the analysis, Grossman considered Feliciano's age, education, work experience, and residual functional capacity, and determined there were no jobs that exist in significant numbers in the national economy that Feliciano could perform. (*Id.*) Using the Medical-Vocational Rules[15] as a framework, he determined that Rule 201.02 directly supported a finding of "disabled," even if Feliciano had transferable job skills. (*Id.*)

Accordingly, Grossman found that Feliciano was not disabled prior to May 15, 2008, but became disabled under section 1614(a)(3)(A) on that date and continued to be disabled through the date of the decision. (*Id.* at 19.)

### 2. The ALJ Properly Reviewed and Considered the Evidence, and Applied the Correct Legal Principles.

#### a. The ALJ Properly Applied the Five-Step Sequential Analysis to the Disability Insurance Claim.

The first task of the Court is to determine whether the Commissioner applied the correct legal principles in evaluating Feliciano's eligibility for disability benefits. *Rosa*, 168 F.3d at 77. The Court finds that he did. (Tr. at 8-23.) To reach his conclusion, Grossman determined whether the insured status requirements of section 216(i) and 223 of the Act were met. (*Id.* at 12.) After reviewing the record, Grossman found that Feliciano's earnings showed that he had acquired sufficient quarters of coverage to remain insured through March 31, 2005. (*Id.*)

---

[15] The Medical-Vocational Rules provide a guide to determine whether there are jobs in the economy for which an individual is fit, based on the individual's age, education, work experience, and RFC.

Accordingly, Feliciano would have to be disabled on or before that date to be entitled to disability benefits. (*Id.*)

After determining that Feliciano met the insured status requirements of the Act through March 31, 2005, Grossman conducted the tests required to satisfy the criteria of the listings. (*Id.* at 12-14.)  Under the first step of the evaluation, Grossman found that Feliciano had not engaged in substantial gainful activity since March 31, 2005, the alleged onset date. (*Id.* at 14.) Grossman noted that although the record indicated Feliciano earned $8,589, a significant amount of income in 2007, it did not reach a level of substantive gainful activity.  (*Id.*)  At the second step of the evaluation, Grossman found that prior to March 31, 2005, " . . . there were no medical signs or laboratory findings to substantiate an impairment." (*Id.* at 15.)  While Feliciano alleged he suffered from depression, back pain, and asthma, Grossman noted that the record contained no medical records of treatment for any of the impairments in 2005 and 2006.  (*Id.*)  Grossman observed that although Feliciano received treatment and MRI's for back pain in September of 2004, this treatment ended in November 2004.  (*Id.* at 15.)  Grossman concluded that this indicated that the injury lasted less than twelve months.  (*Id.*)  Accordingly, he determined that there was no medical evidence to substantiate the existence of a medically determinable impairment prior to March 31, 2005, and therefore Feliciano was not eligible for a period of disability insurance benefits.  (*Id.*)

### b. Substantial Evidence Exists to Support the ALJ's Determination.

#### (1) The ALJ properly evaluated the medical evidence, and applied the treating physician rule in denying Disability Insurance Benefits.

Substantial evidence exists to support Grossman's determination that Feliciano did not have a severe impairment prior to March 31, 2005, the date last insured, (*id.* at 15), and Grossman properly applied the treating physician rule.  Accordingly, Grossman denied DIB

benefits as of January 1, 2004, the alleged onset date. (*Id.*) Feliciano argues that (1) Grossman did not give proper weight to Mr. Albis's evidence under the treating physician rule (*id.*); (2) Grossman incorrectly evaluated his credibility and demonstrated bias while reviewing his claims (*id.*); (3) Medical evidence proves his degenerative back disease in 2004 qualified as a severe impediment under Listing 1.04(a) (Pl. Mem. at 5); (4) Grossman did not appropriately consider medical notes with respect to his asthma claim (*id.*); and (5) Grossman did adequately assess his depression as a medical impairment. (*Id.*)

(a) Substantial Evidence Exists to Support the ALJ's Determination

Feliciano argues that his degenerative back disease in 2004 qualified as a severe impediment under Listing 1.04(A) under step three of the analysis, based on Mr. Albis's treatment notes. (Pl. Mem. at 5.) Listing 1.04 includes disorders of the spine that result in the compromise of the nerve root or the spinal cord with either evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. (Tr. at 15.) However, because Grossman found that Feliciano's degenerative back disease did not result in a severe impairment under step two of the analysis, he was not required to assess whether it qualified as a severe impairment under step three. 20 C.F.R. §§ 404.1520 (a)(4), 416.920 (a)(4). Even if Grossman was required to consider whether Feliciano's condition qualified as a severe impediment under Listing 1.04(A), the condition does not qualify because it did not compromise the nerve root or cause sensory loss. (*Id.*) Medical evidence from 2004 indicated that Feliciano's slightly bulged discs caused slight back pain but did not result in sensory loss. (Tr. at 475-76.)

Feliciano claims that his asthma qualified as a severe impairment prior to March 31, 2005. (Pl. Mem. at 5.) However, he only reported difficulty breathing as a result of asthma once

prior to March 31, 2005. (*Id.* at 496.) Grossman noted that this testimony did not demonstrate that Feliciano's asthma was sufficiently severe to qualify for benefits. (*Id.* at 15). Furthermore, Feliciano's earliest documented treatments occurred in the North Central Bronx Hospital in June 2007, indicating that his impairment was not severe before March 31, 2005. (Tr. at 476.) Similarly, Feliciano did not receive any mental health treatment for his alleged depression prior to 2006, indicating that his depression did not become severe prior to March 31, 2005. (Tr. at 15, 167-68, 262.) While Feliciano reported in the FEGS 2008 Report that he suffered from untreated depression since 2001, (*id.* at 191), Grossman indicated that without accompanying medical records confirming Feliciano's allegations, benefits could not be given. (*Id.* at 15.)

(b) The ALJ Correctly Applied The "Treating Physician Rule"

Feliciano argues that Grossman failed to follow the treating physician rule by not giving adequate weight to Albis's assessment on April 7, 2004, and his final evaluation on March 31, 2009. (Pl. Mem. at 2-4.)) Albis diagnosed Feliciano with the same spinal problems on both dates: herniated discs, cervico-cranial syndrome, and misaligned vertebrae in his upper, middle, and lower back. Albis also determined that a reasonable degree of medical certainty indicated that Feliciano's spinal problems that he diagnosed on March 31, 2009 were the result of the April 7, 2004 motor vehicle accident because of the similarity between the 2004 and 2009 diagnoses. (*Id.* at 484.) Feliciano contends that Albis's assessments support the conclusion that Feliciano was continuously suffering from the spinal problems from April 7, 2004 to March 31, 2009, and that Grossman erred in failing to grant the assessments the proper weight under the treating physician rule. (Pl. Mem. at 2.)

A treating source's opinion must be a *medical* opinion under this provision to obtain "controlling weight." (20 C.F.R. § 404.1527(c)(2)). "Medical opinions are statements from

physicians and psychologists or other acceptable medical sources that reflect judgments about the . . . impairments." (20 C.F.R. § 404.1527(a)(2).)  Section 404.1513(a), which lists the five categories of "acceptable medical sources," does not include chiropractors.  (20 C.F.R. 404.1513(a).)  Chiropractors are listed under the "other sources," whose information "may help us understand how your impairment affects your ability to work."  (20 C.F.R. § 404.1513(d).) Because chiropractors "cannot provide medical opinions," their opinions are "not. . . entitled to controlling weight. *Diaz v. Shalala*, 59 F.3d 307, 312-14 (2d Cir. 1995).  The opinions of Peter Albis therefore do not trigger the treating physician rule.  (*Id.*)

Feliciano also argues that Grossman violated the treating physician rule by failing to seek more information from the treating sources regarding ambiguities in the record.  (Pl. Mem. at 4.) Specifically, Feliciano argues that Grossman violated § 404.1519(h) by speculating on the reason for the gap in the medical records instead of consulting the treating source for additional medical information.  (*Id.*)

An ALJ cannot reject a treating physician's diagnosis "without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Because Albis is not a treating physician, however, there was no requirement to seek additional information. *See Diaz*, 59 F.3d at 312-14.  The evidence in the record does not show a gap in the medical reports provided by Dr. Barakat, who does qualify as a treating physician.  (Tr. at 411, 420.)  Grossman was not required to seek additional information before rejecting a benefits claim.  (*Id.*)

### (c) The ALJ Correctly Evaluated Feliciano's Credibility

Feliciano argues that Grossman selectively considered the record and clearly manifested bias towards him by speculating about Albis's medical assessment.  (Pl. Mem. at 6.) Feliciano

28

argues that Grossman was adversarial in his questioning regarding a former criminal conviction and previous employment in 2007. (*Id.* at 6-7.) Feliciano contends that Grossman "attempted to trick" Feliciano into admitting that he could have worked during 2004 and 2005, which resulted in him making ambiguous statements. (*Id.*)

An ALJ has the discretion to "evaluate the credibility of a claimant and to arrive at an independent judgment in light of the medical finding and other evidence." (*Id.*) (citing *Snell v. Apfel*, 177 F.3d 128, 135 (2d. Cir. 1999)). An ALJ's credibility determination is based on observation, and therefore is entitled to deference on appeal. (*Id.* at 21.) (citing *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d. Cir. 2010)).

Feliciano has not shown an actual conflict of interest or another reason to disqualify the ALJ. *Schrock v. Schrock*, No. 3:12 CV 1898 (*1), (*10) (S.D.N.Y. 2014); *see also Schweiker v. McClure*, 456 U.S. 188, 195 (1982) (noting a presumption that ALJ's are impartial and fair). He has not shown that Grossman's conduct was so extreme that it deprived the hearing of fundamental fairness. *Schrock,* No. 3:12 CV 1898 at (*10)*; see also Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

Grossman determined that Feliciano's testimony was "somewhat credible." (Tr. at 18.) He noted that while Feliciano initially testified that he did not work in 2004 because there were no jobs available, he later stated that he could not have worked because of his depression. (*Id.*) Grossman also noted that Feliciano earned income in 2007, suggesting that he was capable of working several years after the alleged disability. (*Id.*) Feliciano denied earning the $8,589.00 reported and claimed he only received $400.00 "under the table." (Tr. at 18.) Finally, Grossman found that Feliciano first stated he did not work because there were no jobs available. (*Id.*) After clarification, he indicated he could not have worked in 2004 and 2005 but that he would

29

have accepted his previous job if offered the position. (*Id.*) The record thus supports Grossman's concerns about Feliciano's credibility.

### (2) The ALJ properly declined to rely on a vocational expert.

Feliciano argues that the Commissioner has not met its burden at the fifth step of the analysis of showing that "there is other gainful work in the national economy which the plaintiff could perform." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. §423(d)(5); 20 C.F.R. §404.1520. He maintains that Grossman should have sought the testimony of a vocational expert instead of relying solely on the Medical-Vocational Rules (the "Grid Rules"). (Pl. Mem. at 9.) He cites *Pratt v. Charter* for the proposition that the use of a vocational expert is required where the plaintiff experiences non-exertional limitations, [16] such as asthma. (*Id.* at 10.) (citing *Pratt v. Charter*, 94 F.3d 34 (2d. Cir. 1996) ("If there are non-exertional limitations in addition to the exertional, the Grid Rules may not be controlling.")) (Tr. at 15.)

At step five of the analysis, the ALJ bears the burden of proof for the final determination of disability. *Pratt* 94 F.3d at 39. If a claimant suffers only from exertional impairments, then an ALJ will satisfy her burden by applying the Grid Rules. *Id.* If, however, a claimant also suffers from non-exertional impairments, then the Grid Rules may not be controlling and a vocational expert may be used to make a disability determination. *Id.* at 39. A vocational expert is used at step five of the disability analysis when a claimant's non-exertional impairments "significantly limit the range of work permitted by his exertional limitation." *Id.* A claimant's work capacity is "significantly diminished" if there is an "additional loss of work capacity . . . that so narrows a claimant's possible range of work [so] as to deprive him of a meaningful

---

[16] Non-exertional limitations impact a claimant's ability to meet demands of jobs other than the strength demands such as sitting, standing, walking, lifting carrying pushing or pulling. (Section 404.1569(a)).

employment opportunity." *Id.* If a non-exertional impairment does not "significantly diminish" the claimant's ability to work, then a vocational expert is not required and the Grid Rules apply. *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010).

The use of a vocational expert is only used to supplement the Grid Rules at step five of the disability analysis. *Id.* Feliciano was properly found not to be disabled at step two of the analysis, and therefore Grossman was not required to proceed to step five where a vocational expert could be used. 20 CFR §§ 404.1520(a)(4) and 416.920(a)(4). Because step five was not reached, the burden of determining Feliciano's disability did not shift to Grossman. *See Pratt*, 94 F.3d at 38-39. Accordingly, Grossman did not need to request the assistance of a vocational expert in making his disability determination. *Id.*

Even if Grossman had found that Feliciano had a "severe impairment" and proceeded to step five of the analysis, Feliciano's argument has no merit because his asthma did not "significantly diminish" his work capacity. (Tr. at 15.) Feliciano's asthma did not "narrow [his] possible range of work as to deprive him of a meaningful employment opportunity." *Bapp v. Bowen*, 802 F.2d 601, 606 (2d. Cir. 1986). The record does not indicate any treatment for asthma or depressive symptoms prior to 2006. (Tr. at 15.) In sum, Grossman considered Feliciano's asthma along with the medical record and determined that no medically determinable impediment was present. (*Id.*) Without a medical impairment, a vocational expert was not required under the disability analysis.

### c. New Evidence Does Not Warrant Remand, and, Even If Considered, Would Not Lead to a Different Outcome.

As part of Feliciano's request for review of Grossman's decision, he submitted new evidence to the Appeals Council: a representative brief by Daniel Berger, Esq., counsel for Feliciano. (Tr. at 156-59.) A claimant may submit new and material evidence to the Appeals

31

Council as part of a request for review of an ALJ's decision.  20 C.F.R. § 404.970(b); *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  If the evidence relates to a period before the ALJ's decision, the Appeals Council must then "evaluate the entire record including the new and material evidence" and "review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence . . . ." *Perez*, 77 F.3d at 44.  Any new and material evidence submitted forms part of the administrative record for judicial review. *Id.*

In the brief, Feliciano asserts that Grossman committed reversible error by not giving proper weight to Albis's assessment and treatment notes regarding Feliciano's back injury under the treating physician rule.  (Tr. at 157-58.)  He also argues that Grossman did not give enough weight to the MRI's from 2004 indicating Feliciano suffered several bulged discs.  (*Id.* at 158.) Feliciano's brief simply restates arguments he had previously submitted and which had been considered by the ALJ.  Even if the Court were to consider the brief new and material evidence, the brief does not contradict the ALJ's findings.  The ALJ's findings are supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Defendant's motion be **GRANTED**, and that the Complaint be **DISMISSED**.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul G. Gardephe, 40 Foley Square, Room 2204, and to the chambers of the

undersigned, 500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a

waiver of those objections in both the District Court on later appeal to the United States Court of

Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human

Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West. Supp. 1995);

Fed.R.Civ.P. 72, 6(a), 6(d).

**Dated: September 11, 2014**
**New York, New York**

                                           **Respectfully Submitted,**

                                           **The Honorable Ronald L. Ellis**
                                           **United States Magistrate Judge**